# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RITE AID CORPORATION, RITE AID HDQTRS. CORP., JCG (PJC) USA, LLC, MAXI DRUG, INC. D/B/A BROOKS PHARMACY, ECKERD CORPORATION, AND CVS PHARMACY, INC., CAREMARK L.L.C., | Case No. <br><br> JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| UNIMED PHARMACEUTICALS, INC.; SOLVAY PHARMACEUTICALS, INC.; WATSON PHARMACEUTICALS, INC.; PAR PHARMACEUTICALS, INC., and PADDOCK LABORATORIES, INC., | FILED ELECTRONICALLY |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Rite Aid Corporation, Rite Aid Hdqtrs. Corp., JCG (PJC) USA, LLC, Maxi Drug, Inc. (d/b/a Brooks Pharmacy), Eckerd Corporation, CVS Pharmacy, Inc., and Caremark L.L.C., (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this action against Defendants Unimed Pharmaceuticals, Inc., Solvay Pharmaceuticals, Inc. (collectively, with Unimed Pharmaceuticals, Inc., "Solvay"), Watson Pharmaceuticals, Inc. ("Watson"), Paddock Laboratories, Inc. ("Paddock"), and Par Pharmaceuticals, Inc. ("Par") (collectively, "Defendants"). Plaintiffs make the following allegations based upon

personal knowledge as to those matters relating to themselves and upon information and belief as to all other matters.

## I. NATURE OF THE ACTION

1.     This is a civil antitrust action seeking to recover overcharges (trebled) arising out of Defendants' unlawful delay and exclusion of generic competition from the market for AndroGel, a drug marketed by Solvay as a testosterone replacement therapy ("TRT") for males with a deficiency or absence of endogenous testosterone.

2.     As detailed below, Solvay entered a conspiracy to restrain trade, and engaged in a scheme to monopolize the U.S. market for the drug sold under the brand name AndroGel and its AB-rated generic equivalents, by substantially delaying the onset of generic competition of AB-rated generic versions of AndroGel.  Among other aspects of its exclusionary scheme, Solvay: (a) wrongfully listed its U.S. Patent No. 6,503,894 ("the '894 Patent") in the Food and Drug Administration ("FDA") publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations (commonly referred to as the "Orange Book"); (b) wrongfully filed and prosecuted baseless, sham litigation against its prospective generic competitors Par, Paddock, and Watson (collectively the "Generic Defendants") in order to trigger automatic 30-month regulatory stays prohibiting the FDA from granting final approval to companies seeking to sell AB-

rated generic versions of AndroGel; and (c) entered into agreements with the Generic Defendants, whereby Solvay agreed in September 2006 to pay the Generic Defendants millions of dollars, as well as provide other compensation, in exchange for agreements by the Generic Defendants not to sell their respective AB-rated generic versions of AndroGel for nearly a decade.  Specifically, through these agreements, the Generic Defendants agreed not to compete with Solvay's AndroGel product until at least 2015.

3.      AB-rated generic versions of brand name drugs must contain the same active ingredient as, be bioequivalent to, have the same size, strength, dosage form, and route of administration as, and must have been found by the FDA to be just as safe and effective as, their brand name counterparts.  The only material difference between generics and their brand name counterparts is their price – generics are typically at least 30% less expensive than their brand counterparts when there is a single generic competitor; this discount typically increases to 50-80% (or more) when there are multiple generic competitors on the market.  As a result, generics constitute both: (a) an opportunity for drug purchasers and consumers to obtain enormous cost savings; and (b) a serious threat to the monopoly power and profits of the manufacturer of the brand name drug facing generic competition.  Indeed, AB-rated generic versions of brand name drugs typically take 80% or more of the sales of the brand name product within a year of generic entry.

4.     The dollar value of a specific drug's market generally decreases dramatically upon generic entry because the cost of an average daily dose of the brand or generic equivalent drops due to the much lower price of the generic.  For example, a drug with annual sales of $400 million prior to generic entry can see the dollar-value of its market – even if the total number of prescriptions remains the same – drop to under $100 million following generic entry.  While this drop allows purchasers to buy the AB-rated generic at a fraction of the cost of the brand drug, and thus save money, it also presents a strong financial incentive for branded and generic manufacturers to collude and split the (in this example) $300 million surplus (savings) that would have otherwise gone to purchasers.  By delaying generic entry, brand and generic manufacturers are able to capture excess profits and split the much higher initial dollar value of the market instead of earning, as they would in a competitive environment, much lower profits based only on the post-generic-entry dollar value of the market.  That is precisely what Defendants did here.

5.     In order to maintain supra-competitive pricing, Solvay and the Generic Defendants agreed to delay generic entry until 2015 and 2016 and share in the supracompetitive profits earned unlawfully during that period of delay.  Solvay's multi-million dollar payments to the Generic Defendants compensated them for agreeing to delay their market entry.  Solvay knew that it would reap

excess profits during that period of unlawful delay.  Defendants' anticompetitive agreements, therefore, were in Defendants' financial interest – and contrary to the interests of competition and drug purchasers.

6.      Acutely aware of these economic realities of the pharmaceutical industry, Solvay engineered a scheme to delay generic competition to AndroGel.

7.      As part of its scheme, Solvay improperly listed the '894 patent in the Orange Book.  Solvay knew that under the 1984 Hatch-Waxman amendments to the Food, Drug and Cosmetics Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman") their new dosage form exclusivity for AndroGel was set to expire on February 28, 2003 and ANDAs seeking to market generic versions of AndroGel were likely to be filed seeking approval for marketing immediately thereafter.  Therefore, Solvay desperately tried to obtain a patent it could argue covered AndroGel before this exclusivity expired. In January 2001, nearly a year after Androgel came to market, and with less than two months before its exclusivity was set to expire, Solvay obtained the '894 patent.

8.      At the time Solvay submitted the '894 patent for listing in the Orange Book, Solvay knew that the listing was improper since Solvay was only entitled to list the '894 Patent in the Orange Book if the patent (1) claimed AndroGel or an approved method of using AndroGel and (2) a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the

manufacture, use, or sale of AndroGel.  However, Solvay knew that the listing was improper because, *inter alia*, (a) originally issued claims 1-30 of the '894 patent (as well as the subsequently "corrected" versions of those claims) were invalid because there was no written description support for the sodium hydroxide range stated therein; and (b) none of the originally issued claims could reasonably be construed as covering AndroGel or a method of using AndroGel.  As detailed below, Solvay knew that its slapdash efforts to convince the PTO to issue the patent prior to the expiration of AndroGel's marketing exclusivity had resulted in errors that prevented the '894 patent from covering AndroGel or an approved method of using AndroGel.

9.     After improperly listing the '894 patent in the Orange Book, Solvay improperly filed sham lawsuits against the Generic Defendants, claiming infringement of the '894 patent.  As detailed below, no reasonable litigant could have realistically expected Solvay's patent infringement suits against the Generics to succeed because, *inter alia*, (a) originally issued claims 1-30 of the '894 patent (as well as the subsequently "corrected" versions of those claims) were invalid because there was no written description support for the sodium hydroxide range stated therein; (b) none of the originally issued claims could reasonably be interpreted as covering generic versions of AndroGel or a method of using generic versions of AndroGel; (c) the Generic Defendants could not reasonably be viewed

as infringing any of claims 1-30 of the '894 patent even as "corrected" because the certificate of correction was inapplicable to the litigation initiated before the certificate issued, and the certificate was invalid because Solvay affirmatively misrepresented facts to the PTO in order to obtain it; and (d) claim 31 and its dependent claims could not reasonably be read to cover the use of the Generic Defendants' generic AndroGel products because Solvay purposefully excluded sodium hydroxide from claim 31 and sodium hydroxide materially affects the basic and novel properties of the invention. Solvay's knowledge that the Generic Defendants did not infringe claims 1-30 of the '894 patent as issued is evidenced by the fact that Solvay filed a Request for Certificate of Correction of the '894 patent before it filed the patent infringement suits against the Generic Defendants.

10.    Solvay's improper listing of the '894 patent litigation and sham litigation on the '894 patent was anticompetitive because, *inter alia*, this conduct prevented FDA from approving the Generic Defendants' generic AndroGel products until expiration of the 30-month stays. But for the improper listing and sham litigation, Watson could have, and would have, begun marketing its generic AndroGel product immediately upon receiving FDA approval which would have occurred by no later than January 27, 2006. But for Defendants' wrongful conduct, Par/Paddock would have had the ability and the incentive to get final FDA approval before May 27, 2007. But for the improper listing and sham

litigation, Par/Paddock could have, and would have, begun marketing its generic AndroGel product no later than May 27, 2007.

11.    Invoking the automatic 30-month stay of FDA approval by filing baseless, sham litigation against the Generic Defendants was central to Solvay's scheme because Solvay knew that it could not have obtained a preliminary injunction preventing the Generic Defendants from launching their generic versions of AndroGel.  In order to obtain a preliminary injunction preventing Watson and Paddock from marketing their generic AndroGel products, Solvay would have been required to establish, *inter alia*, that it was likely to succeed on the merits of its patent infringement suits.  Solvay, however, could not have demonstrated a likelihood of success because its patent infringement claims against the Generic Defendants were baseless shams or, in the alternative, fatally weak.

12.    Rather than permit the Generic Defendants' challenge to Solvay's '894 patent to proceed to trial, Solvay paid the Generic Defendants millions of dollars in exchange for their agreements not to market their less expensive AB-rated generic versions of AndroGel until either 2015 or 2016 (i.e., for nearly a decade after their 2006 agreements). Defendants disguised these "exclusion payments" as payments ostensibly for: (i) licensing and/or co-promotion of AndroGel (to Watson and Par); and/or (ii) back-up manufacturing of AndroGel (to Par).  Defendants intentionally concealed the true purpose and nature of these

exclusion payments in an attempt to shield their exclusionary agreements from antitrust scrutiny.

13.     Defendants' agreements are anticompetitive because Defendants apportioned to themselves the surplus from competitive generic entry that would have and should have accrued to purchasers of AndroGel and its generic equivalents.

14.     In order to maintain supra-competitive pricing, Solvay and the Generic Defendants agreed to delay generic entry until 2015 and 2016 and share in the supracompetitive profits earned unlawfully during that period of delay. Solvay's multi-million dollar payments to the Generic Defendants compensated them for agreeing to delay their market entry.  Solvay itself knew that it would reap excess profits during that period of unlawful delay.  Defendants' anticompetitive agreements, therefore, were in the financial interest of each of the Defendants, but harmed drug purchasers, consumers, competition and consumer welfare.

15.     As detailed below, absent the Defendants' illegal scheme, generic competitors would have been able to successfully market AB-rated generic versions of AndroGel by now, substantially before 2015.

16.     Had there been free and fair competition, Plaintiffs would have paid less for their Androgel requirements than they paid because of Defendants' illegal acts to delay generic competition.

17.     Defendants, though their illegal scheme: (1) illegally maintained Solvay's monopoly power with respect to Androgel and its generic equivalents in the United States; (2) fixed, raised, maintained, and/or stabilized prices for Androgel and its generic equivalents at supra-competitive levels; and (3) overcharged Plaintiffs by millions of dollars by delaying competition from cheaper AB-rated generic versions of AndroGel.

18.     Defendants' "exclusion payment" agreements constitute horizontal market allocation agreements, which are per se violations of Section 1 of the Sherman Act, and, in the alternative, are anticompetitive under the Rule of Reason. Defendants' conduct also constitutes a conspiracy to restrain trade, in violation of Section 1 of the Sherman Act.

19.     Similarly, as alleged in more detail below, Defendants violated Section 2 of the Sherman Act through their scheme to improperly maintain and extend Solvay's monopoly power by foreclosing or delaying competition from lower-priced AB-rated generic versions of AndroGel.

20.     Solvay willfully maintained monopoly power with respect to Androgel and its generic equivalents through willfully exclusionary conduct, as

distinguished from growth or development as a consequence of a legally obtained

valid patent, other legally obtained market exclusivity, a superior product, business

acumen or historical accident.

## II.    JURISDICTION AND VENUE

21.    This Complaint is filed under Section 4 of the Clayton Act, 15 U.S.C.

§ 15, to recover threefold damages and the costs of suit and reasonable attorneys'

fees, for the injuries sustained by Plaintiffs from Solvay resulting from the

violation by the Defendants, as hereinafter alleged, of Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1, 2.  The jurisdiction of this Court is based upon 28

U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

22.    Defendants transact business within this district, and the interstate

trade and commerce, hereinafter described, is carried out, in substantial part, in this

district.  Venue, therefore, is appropriate within this district under 15 U.S.C. § 22,

and 28 U.S.C. § 1391(b) and (c).

## III.    THE PARTIES

23.    Plaintiffs Rite Aid Corporation and Rite Aid Hdqtrs. Corp.

(collectively "Rite Aid") are corporations organized and existing under the laws of

the State of Delaware with a principal place of business in Camp Hill,

Pennsylvania.  Rite Aid purchases substantial quantities of pharmaceutical

products and other goods for resale to the public through more than 5,000

drugstores owned and operated by its affiliates.  During the relevant period of time, Rite Aid has purchased AndroGel directly from Solvay as well as from wholesaler McKesson Corporation ("McKesson").  McKesson purchases AndroGel directly from Solvay, and Rite Aid is the assignee of McKesson's antitrust claims with respect to AndroGel that was subsequently resold to Rite Aid.  Rite Aid brings this action in its own right and as the assignee of McKesson.

24.     Plaintiff JCG (PJC) USA, LLC ("JCG USA") is a Delaware limited liability corporation with a principal place of business in Camp Hill, Pennsylvania. On June 4, 2007, JCG USA became a wholly-owned subsidiary of Rite Aid Corporation.  JCG USA is the parent corporation of Plaintiffs Maxi Drug, Inc. d/b/a Brooks Pharmacy ("Brooks") and Eckerd Corporation ("Eckerd"), both of which are Delaware corporations.  JCG USA, Brooks and Eckerd hereafter are collectively referred to as "Brooks/Eckerd."  Brooks/Eckerd purchases substantial quantities of pharmaceutical products and other goods for resale to the public through its retail stores.  During the relevant period of time, Brooks/Eckerd has purchased AndroGel directly from Solvay as well as from McKesson.  McKesson purchases AndroGel directly from Solvay, and Brooks/Eckerd is the assignee of McKesson's antitrust claims with respect to AndroGel that was subsequently resold to Brooks/Eckerd.  Brooks/Eckerd brings this action in its own right and as the assignee of McKesson.

25.    Plaintiff CVS Pharmacy, Inc. ("CVS") is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Woonsocket, Rhode Island.  CVS purchases substantial quantities of pharmaceutical products and other goods for resale to the public through more than 6,300 drugstores operated by its affiliates.  During the relevant period of time, CVS has purchased AndroGel directly from Solvay as well as from wholesalers Cardinal Health, Inc. ("Cardinal") and McKesson.  Cardinal and McKesson purchase AndroGel directly from Solvay, and CVS is the assignee of McKesson's and Cardinal's antitrust claims with respect to AndroGel that was subsequently resold to CVS.  CVS brings this action in its own right and as the assignee of Cardinal and McKesson.

26.    Plaintiff Caremark, L.L.C.  ("Caremark") is a California limited liability company having its principal place of business in Nashville, Tennessee.  Caremark purchases substantial quantities of pharmaceutical products and other goods, including AndroGel, for resale to the public through approximately eleven mail service pharmacies and seventy specialty pharmacies owned and operated by its affiliates.  During the relevant period of time, Caremark has purchased AndroGel directly from Solvay and from McKesson.  McKesson purchases AndroGel directly from Solvay, and Caremark is the assignee of McKesson's antitrust claims with respect to AndroGel that was subsequently

resold to Caremark.  Caremark brings this action in its own right and as the assignee of McKesson.

27.     Defendant Solvay Pharmaceuticals, Inc. is a Georgia corporation with its principal place of business in Marietta, Georgia.  Solvay is the U.S. subsidiary of Solvay Pharmaceuticals.  Together with its wholly owned subsidiary Defendant Unimed (collectively, "Solvay"), Solvay develops, manufactures, and markets pharmaceuticals and related products, including AndroGel, in the United States. Defendant Solvay itself negotiated and/or approved Unimed Pharmaceuticals, Inc.'s relevant anticompetitive agreements concerning AndroGel, the filing and prosecution of the patent cases against Par/Paddock and Watson, and has a financial interest in AndroGel.

28.     Defendant Unimed Pharmaceuticals, Inc. is a wholly owned subsidiary of Solvay Pharmaceuticals, Inc., that develops, manufactures, and markets pharmaceuticals and related products, including AndroGel, in the United States.  Unimed Pharmaceuticals, Inc. focuses on developing and marketing drugs with multiple indications in the therapeutic areas of cardiology, men's health (urology and endocrinology) and certain infectious diseases.

29.     Defendant Par Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Woodcliff Lake, New Jersey.  Par principally develops, manufactures and markets generic versions of brand name drugs.

30.     Defendant Paddock Laboratories, Inc. is a privately-held pharmaceutical company located in Minneapolis, Minnesota.  Paddock principally develops, manufactures and markets generic versions of brand name drugs.

31.     Defendant Watson Pharmaceuticals, Inc. is a Nevada corporation with its principal place of business in Corona, California.  Watson principally develops, manufactures and markets generic versions of brand name drugs.

## IV.   FACTUAL ALLEGATIONS

**A.     The Regulatory Structure Pursuant to Which Generic Substitutes for Brand Name Drugs Are Approved**

32.     Under the Federal Food, Drug, and Cosmetics Act (21 U.S.C. §§ 301-392), manufacturers who create a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA").  An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

33.     In 1984, Congress amended the Food, Drug and Cosmetics Act with the enactment of the Hatch-Waxman amendments, called the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman").

34.     Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval.  Instead, the FDA provides an expedited

15

review process by which generic manufacturers may file an Abbreviated New

Drug Application ("ANDA").

35.    The ANDA relies on the scientific findings of safety and effectiveness

included by the brand name drug manufacturer in the original NDA.  The ANDA

filer must demonstrate to the FDA that the generic drug it proposes to market is

bioequivalent to the brand name drug.

36.    As a counter-balance to this abbreviated process for bioequivalent

generic drugs, Hatch-Waxman streamlined the process for a brand name

manufacturer to enforce its patents against infringement by generic manufacturers,

and provided that, under certain conditions (as detailed below), the FDA could not

grant a generic manufacturer final approval to market or sell a generic version of

the brand name drug for up to 30 months.

37.    When the FDA approves a brand name manufacturer's NDA, the

FDA publishes any compound patents which (according to the brand name

manufacturer) claim the approved drug in a publication entitled the "Approved

Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange

Book."  21 U.S.C. § 355(j)(7)(A)(iii).  In the case of method of use patents, the

FDA lists in the Orange Book any patents which (according to the brand name

manufacturer) claim the approved drug for its approved method of use.  In listing

patents in the Orange Book, the FDA merely performs a ministerial act.  The FDA

does not check the facts supplied to it by the brand name manufacturer, but trusts that the manufacturer will be truthful. After the NDA is approved, the brand name manufacturer may list other new patents in the Orange Book as related to the NDA, if the brand name manufacturer similarly certifies, *inter alia*, that the new patents claim either the approved drug (for compound patents) or that the patents claim the approved drug for approved methods of use (for method-of-use patents). The patent NDA holder is required to list the patent in the Orange Book within 30 days of issuance. 21 U.S.C. §§ 355 (b)(1) & (c)(2).  If the NDA holder does not do so, it cannot invoke the 30 month stay under the Hatch-Waxman Act by suing on the late listed patent.

38.     To obtain FDA approval of an ANDA (and thus the right to sell a generic version of a brand name drug), a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book.  Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications: i. that no patent for the brand name drug has been filed with the FDA (a "Paragraph I certification"); ii. that the patent for the brand name drug has expired (a "Paragraph II certification"); iii. that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or iv. that the patent for the brand name drug is invalid or will not

be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").  21 U.S.C. § 355(j)(2)(A)(vii).

39.     If a generic manufacturer files only Paragraph I, II, or III certifications, then it is able to take advantage of the expedited Hatch-Waxman approval process, and the FDA must act on the application within 180 days of receipt, unless both the FDA and the applicant agree to extend the deadline.  21 U.S.C. § 355(j)(5)(A).

40.     If a generic manufacturer files a Paragraph IV certification claiming that a patent listed in the Orange Book is invalid or will not be infringed, a brand name manufacturer has an opportunity to delay the final FDA approval of the ANDA and the sale of the competing generic drug on the market.  When a generic drug manufacturer files a Paragraph IV certification with its ANDA, the generic manufacturer must promptly give notice of its certification to both the NDA-holder and the owner of the patent(s) at issue. If the NDA-holder initiates a patent infringement action against the ANDA filer within 45 days of receiving the Paragraph IV certification, then the FDA may not grant final approval to the ANDA until the earlier of either: (a) 30 months from the date the ANDA is filed; or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii). Thus, by listing a patent in the Orange Book and filing a suit within 45 days of receiving a

Paragraph IV certification regarding the listed patent, a brand name drug

manufacturer may delay when the generic drug is finally approved by the FDA,

and when generic competition to the brand name drug enters the market.  During

the pendency of the 30 month stay, the FDA may grant "tentative approval" to an

ANDA applicant if the FDA determines that the ANDA would otherwise qualify

for final approval but for the stay.

41.    Because of the FDA rules alleged above, brand name manufacturers

have an incentive to: (a) list patents in the Orange Book, even if such patents are

not eligible for listing; and (b) then sue any generic competitor that files an ANDA

with Paragraph IV certifications, even if such competitor's product does not

actually infringe the listed patent(s), in order to delay final FDA approval of an

ANDA for up to 30 months.

**B.    Generic Versions of Brand Name Drugs are Significantly Less Expensive, and Take Significant Sales Directly From the Corresponding Brand Name Versions.**

42.    Typically, AB-rated generic versions of brand name drugs are priced

significantly below the brand name versions.  A 1998 Congressional Budget Office

Report estimates that in 1994 alone, purchasers saved $8 to $10 billion on

prescriptions at retail pharmacies by purchasing generic drugs instead of the

corresponding branded drug. A 2004 FDA study calculates that patients could

reduce the daily costs of their medications by more than 50 percent by purchasing generic drugs when available.

43.    Significant purchaser savings typically result when generic companies successfully challenge patents and enter prior to patent expiration. For example, a generic company's successful challenge invalidating a patent covering the antidepressant drug Prozac resulted in generic entry 2.5 years before patent expiry and about $2.5 billion in estimated savings to drug purchasers. Another successful challenge invalidating patents covering the cancer drug Taxol resulted in generic entry over 11 years before patent expiry and estimated savings to purchasers of more than $3.5 billion.

44.    Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions of brand drugs are rapidly and substantially substituted for their brand name counterparts.  In every state, pharmacists are permitted (and, in most states, required) to substitute an AB-rated generic product for a brand name product unless the doctor has indicated that the prescription for the brand name product must be dispensed as written.  As more generic manufacturers enter the market with AB-rated generics to the brand product, prices for AB-rated generic versions of a drug predictably decrease even further because of competition among the generic manufacturers, and the loss of

sales volume by the brand name drug to the corresponding AB-rated generic accelerates.

45.     An AB-rating is particularly significant to a generic manufacturer because, under the statutory regime enacted by both Congress (*i.e.*, Hatch-Waxman) and most state legislatures (which enacted Drug Product Selection, or DPS laws), pharmacists may substitute an AB-rated generic version of a drug for the brand name without seeking or obtaining permission from the prescribing doctor (unless the prescription is denominated "Dispense as Written," or DAW). Indeed, both Congress and the state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously: (a) engaging in the type of heavy promotion or "detailing" typically done by brand name manufacturers; and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

46.     AB-rated generic competition enables Plaintiffs to: (a) purchase generic versions of the drug at substantially lower prices; and/or (b) purchase the brand name drug at a reduced price.  However, until an AB-rated generic manufacturer enters the market, there is no AB-rated generic drug which competes with the brand name drug, and therefore, the brand name manufacturer can continue to charge supracompetitive prices profitably without losing all or a

substantial portion of its brand name sales. Consequently, brand name drug manufacturers have a strong interest to use the tactics alleged herein to delay the introduction of generic competition into the market.

     **C.**    **Solvay's Prosecution of the '894 Patent and the Certificate of Correction**

47.    AndroGel is a brand name drug marketed by Solvay as replacement therapy in males for conditions associated with a deficiency or absence of endogenous testosterone. AndroGel is indicated to treat those with primary hypogonadism and hypogonadotropic hypogonadism.

48.    Testosterone, the hormone contained in AndroGel, is unpatented. Patents covering the synthesis of artificial testosterone expired decades ago.

49.    AndroGel is a gel formulation of testosterone that allows for topical application and controlled release of testosterone into the bloodstream.

50.    In 1995, Unimed licensed AndroGel from Besins.

51.    In 1999, Solvay acquired Unimed, which is now a wholly-owned subsidiary of Solvay.

52.    The FDA approved Solvay's NDA No. 021015 for AndroGel in February 2000, and Solvay began selling AndroGel shortly thereafter. FDA approved AndroGel for 3 years of exclusivity due to Solvay having conducted clinical studies essential to its approval.

53.     Approximately six months later, Solvay filed United States Patent Application Serial No. 09/651,777 ("the '777 Application") with the PTO on August 30, 2000.  The '894 Patent issued from the '777 Application on January 7, 2003.  Solvay and Besins jointly owned the '777 application and the '894 patent. The patent did not claim testosterone itself or methods of using testosterone generally, but rather covered the use of a particular pharmaceutical gel formulation containing testosterone and other specified ingredients in certain amounts.

54.     As described in a report by the United States Government Accountability Office, patent examiners are generally expected to process an average of 87 patent applications per year and have time quotas of a total of 19 hours to process each application from its filing through its final acceptance or rejection.  These time quotas are reinforced by examiners' bonus compensation, which is largely tied to the number of applications processed to completion. The patent application process is an ex parte process in which patent examiners rely upon the information and candor of applicants.  The vast majority of all patent applications are ultimately granted.

55.     In prosecuting the patent application relating to AndroGel, Solvay submitted to the patent examiner multiple disclosure statements identifying more than 400 articles and patents discussing previous testosterone and hormone therapies, together with copies of each of these hundreds of articles and patents in

multiple notebooks, comprising more than three feet of materials for the examiner to attempt to review.  In addition, Solvay filed more than 240 additional pages of papers, responses, amendments, and declarations.

56.    The '777 Application and '894 Patent are directed to pharmaceutical compositions containing testosterone gel formulations and methods of using these compositions to treat hypogonadism.

57.    None of the originally filed claims in the '777 Application recited sodium hydroxide, whose chemical symbol is "NaOH."

58.    Indeed, the sole reference to sodium hydroxide in the entire specification is in Table 5 (reproduced below), which discloses a single formulation having a very specific amount (*i.e.*, 4.72 grams) of a very specific sodium hydroxide solution (*i.e.*, 0.1 N NaOH).

### TABLE 5

**COMPOSITION OF ANDROGEL®**

| SUBSTANCE | AMOUNT (w/w) PER 100g OF GEL |
|---|---|
| Testosterone | 1.0g |
| Carbopol 980 | 0.90g |
| Isopropyl myristate | 0.50g |
| 0.1 N NaOH | 4.72g |
| Ethanol (95% w/w) | 72.5g* |
| Purified water (qsf) | 100.0g |

*corresponding to 67g of ethanol

24

Nowhere did the '777 Application disclose the concept of a range of sodium hydroxide concentrations in the pharmaceutical formulation.

59.     The phrase "0.1 N" indicates that the sodium hydroxide is in a dilute aqueous solution (roughly 4 grams of sodium hydroxide per 1000 grams of solution), as opposed to the pure (anhydrous) form of sodium hydroxide.  4.72 grams of a 0.1 N NaOH solution contains approximately 0.019 grams of sodium hydroxide and approximately 4.70 grams of water.  Thus, the overall concentration of sodium hydroxide concentration in the AndroGel formulation described in Table 5 was roughly 0.019 percent (0.019 grams in a total of 100 grams of formulation).

60.     On October 29, 2001, Solvay filed an Amendment with the PTO that cancelled certain originally-filed claims and added others.  New dependent claims 45 and 64 recited sodium hydroxide.  In both of these new dependent claims, the term "sodium hydroxide" appears alone without any indication of either (1) a range (*e.g.*, "about 1% to about 5%") or (2) a modifier indicating that the recited amount reflected the weight of a dilute solution (e.g., "0.1 N") rather than the weight of pure (anhydrous) sodium hydroxide.  The remarks in Solvay's submission did not mention either these dependent claims or sodium hydroxide.

61.     On December 20, 2001, Solvay filed a Supplemental Amendment, cancelling dependent claims 45 and 64 and adding new claims. Neither the new claims nor the applicants' remarks mentioned sodium hydroxide.

62.     On February 2, 2002, Solvay filed a Second Supplemental Amendment.  Among other things, the Second Supplemental Amendment changed all independent claims (except for one) to recite weight ranges for pure (anhydrous) sodium hydroxide, *i.e.*, "about 1% to about 5%" and "about 1% to about 3%."  None of those proposed claims referred to the weight ranges as referring to a dilute solution (*e.g.*, 0.1 N).  As support for these claims, Solvay cited Table 5 and stated: "Note that 4.72g of 0.1 NaOH = 1.8g NaOH in 100g of gel, or about 1.8%."  By making that statement – *i.e.*, by converting the 4.72 grams of a 0.1 N solution of sodium hydroxide in AndroGel to a measure of pure (anhydrous) sodium hydroxide – Solvay demonstrated its intent to express the sodium hydroxide limitation in the claims as pure sodium (anhydrous) hydroxide rather than as a 0.1 N solution.  The remarks did not otherwise mention sodium hydroxide.

63.     While the 1.8g NaOH in 100g of gel is within the range of "about 1% to about 5%" and "about 1% to about 3%" range recited in the then newly-added claims, there was no other calculation involving sodium hydroxide supplied by Solvay supporting this range.

64.     Significantly, the calculation converting the 4.72g of 0.1 N NaOH to its equivalent amount in pure form in the AndroGel composition was in error by a factor of roughly 100.  That is, the equivalent amount of pure sodium hydroxide in

the AndroGel composition in Table 5 is not 1.8 grams, but rather 0.018 grams, per 100 grams of gel.

65.    Subsequent to filing the Second Supplemental Amendment, Solvay further amended the claims reciting sodium hydroxide on two separate occasions, but on neither occasion did Solvay seek to amend the claims to recite the ranges for sodium hydroxide in a solution by inserting "0.1 N" or the like.

66.    By way of summary: (1) the specification of the '777 Application provides no written description support for any range of concentrations of sodium hydroxide (whether pure or in solution) and the sole mention of sodium hydroxide is a single concentration in a single formulation as reflected in Table 5; and (2) when claims were later added reciting ranges of sodium hydroxide – additions for which there was absolutely no written description support – those ranges indisputably referred to ranges of amounts of pure (anhydrous) sodium hydroxide rather than ranges of amounts of a dilute sodium hydroxide solution such as 0.1 N.

67.    On January 7, 2003 the '894 Patent issued. The five independent claims (*i.e.*, claims 1, 9, 10, 18, and 31) recite

1.    A pharmaceutical composition, consisting essentially of:
   a.    about 0.5% to about 10% testosterone;
   b.    about 30% to about 98% alcohol selected from the group consisting of ethanol and isopropanol;
   c.    about 0.1% to about 5% isopropyl myristate;
   d.    about 1% to about 5% sodium hydroxide; and

       e.     about 0.1% to about 5% of a gelling agent, wherein the percentages of components are weight to weight of the composition.

9.     A hydroalcoholic gel formulation, consisting essentially of:
     a.     about 1% to about 2% testosterone;
     b.     about 50% to about 75% ethanol;
     c.     about 0.5% to about 2% isopropyl myristate;
     d.     about 1% to about 3% sodium hydroxide;
     e.     about 0.5% to about 2% polyacrylic acid; and
     f.     water in an amount sufficient to make the formulation 100%;
wherein the percentages of components are weight to weight of the formulation.

10.     A unit dose packet comprising inner and outer surfaces, and a pharmaceutical composition inside the packet, the composition consisting essentially of:
     a.     about 0.5% to about 5% testosterone;
     b.     about 30% to about 98% ethanol;
     c.     about 0.1% to about 5% isopropyl myristate;
     d.     about 1% to about 5% sodium hydroxide; and
     e.     about 0.1% to about 5% of a gelling agent;
wherein the percentages of components are weight to weight of the composition.

18.     A method for administering an active agent to a human subject in need thereof, the method comprising:
     a.     providing a phannaceutical [sic] composition consisting essentially of:
     (i)     about 0.5% to about 5% testosterone;
     (ii)     about 0.1% to about 5% of a gelling agent;
     (iii)     about 0.1% to about 5% isopropyl myristate;
     (iv)     about 1% to about 5% sodium hydroxide; and
     (v)     about 30% to about 98% alcohol

selected form the group consisting of ethanol and isopropanol;

wherein the percentages are weight to weight of the composition; and

b.    applying a daily dose of the composition to skin of the subject in an amount sufficient for the testosterone to reach the bloodstream of the subject so as to achieve a serum concentration within a range between about 300 ng testosterone per dl serum to about 1050 ng testosterone per dl serum within at least about 36 hours of daily dosing of the composition.

31.    A method for administering an active agent to a human subject in need thereof, the method comprising:

a.    providing a pharmnaceutical [sic] composition consisting essentially of:

(i)    about 0.5% to about 5% testosterone;

(ii)    about 0.1% to about 5% isopropyl myristate;

(iii)    about 30% to about 98% of an alcohol selected from the group consisting of ethanol and isopropanol; and

(iv)    about 0.1% to about 5% of a gelling agent;

wherein the percentages are weight to weight of the composition; and

b.    applying a daily dose of the composition to skin of the subject in an amount sufficient for the testosterone to reach the bloodstream of the subject wherein serum concentration is substantially maintained between about 400 ng testosterone per dl serum to about 1050 ng testosterone per dl serum for at least 24 hours after the subject has applied the daily dose of the composition for at least 2 consecutive days.

Thus, each of claims 1, 9, 10, and 18 specify that the pure sodium hydroxide accounts for at least "about 1%" sodium hydroxide on a "weight to weight basis."

68.     Within 30 days of its issuance in January 2003, Solvay submitted the '894 Patent for listing in the Orange Book along with a declaration signed under oath pursuant to 21 C.F.R. 314.53 certifying that one or more of the issued claims of the '894 Patent covered AndroGel, or an approved method of using AndroGel, and that the '894 Patent could reasonably be asserted against a person who engaged in the unauthorized manufacture, use, or sale of AndroGel.

69.     On or about June 12, 2003, Solvay requested that the Patent and Trademark Office "correct" many claims of the '894 patent. As Solvay knew, the '894 patent as issued did not claim the generic AndroGel product that was the subject of Generic Defendants' ANDAs.  This is because, *inter alia*, like the FDA-approved AndroGel product, Watson and Paddock's generic AndroGel products do not contain the concentration levels of pure sodium hydroxide required by the relevant claims of the '894 patent as issued.

70.     Solvay knew that the Generic Defendants did not plan on marketing the compositions claimed in the relevant claims of the '894 patent because the composition in the relevant '894 patent claims would be too caustic to be used on human skin and the generic companies sought to market their product as an AB-

rated equivalent of Solvay's AndroGel which contained lower levels of sodium

hydroxide in a solution that would not be too caustic to the human skin.

71.    Solvay sought to "correct" this by filing a Request for a Certificate of

Correction ("COC") with the PTO.  Among other things, the Request sought to add

the phrase "0.1 N"  before the term "sodium hydroxide" in claims 1, 9, 10, and 18

of the '894 Patent.  Solvay represented to the PTO that "the mistakes were made in

good faith and that the proper language is contained throughout the specification,

see, for example, column 13, Table 5 ("0.1 N NaOH" (sodium hydroxide)).  As

such, the correction does not involve such changes in the patent that would

constitute new matter or that would require reexamination."  *See* Ex. 3 to Watson's

Memorandum of Law in Support of Its Motion for Partial Summary Judgment, at

WA707.  Solvay did not disclose to the PTO that (1) the reference to "0.1 N

NaOH" appeared only once in (rather than "throughout") the specification and (2)

the change did introduce "new matter" because the specification nowhere disclosed

any ranges for "0.1 N NaOH" as recited by the purportedly "corrected" claims.

72.    The COC issued on December 16, 2003.  As "corrected," the five

independent claims (*i.e.*, claims 1, 9, 10, 18, and 31) recite

> 1.    A pharmaceutical composition, consisting essentially
> of:
>    a.    about 0.5% to about 10% testosterone;
>    b.    about 30% to about 98% alcohol selected from
>          the group consisting of ethanol and
>          isopropanol;

     c.      about 0.1% to about 5% isopropyl myristate;
     d.      about 1% to about 5% 0.1 N sodium hydroxide; and
     e.      about 0.1% to about 5% of a gelling agent,
wherein the percentages of components are weight to weight of the composition.

9.      A hydroalcoholic gel formulation, consisting essentially of:
     a.      about 1% to about 2% testosterone;
     b.      about 50% to about 75% ethanol;
     c.      about 0.5% to about 2% isopropyl myristate;
     d.      about 1% to about 3% 0.1 N sodium hydroxide;
     e.      about 0.5% to about 2% polyacrylic acid; and
     f.      water in an amount sufficient to make the formulation 100%;
wherein the percentages of components are weight to weight of the formulation.

10.     A unit dose packet comprising inner and outer surfaces, and a pharmaceutical composition inside the packet, the composition consisting essentially of:
     a.      about 0.5% to about 5% testosterone;
     b.      about 30% to about 98% ethanol;
     c.      about 0.1% to about 5% isopropyl myristate;
     d.      about 1% to about 5% 0.1 N sodium hydroxide; and
     e.      about 0.1% to about 5% of a gelling agent;
wherein the percentages of components are weight to weight of the composition.

18.     A method for administering an active agent to a human subject in need thereof, the method comprising:
     a.      providing a pharmaceutical [sic] composition consisting essentially of:
        (i)      about 0.5% to about 5% testosterone;
        (ii)     about 0.1% to about 5% of a gelling agent;

          (iii)    about 0.1% to about 5% isopropyl myristate;

          (iv)    about 1% to about 5% 0.1 N sodium hydroxide; and

          (v)    about 30% to about 98% alcohol selected form the group consisting of ethanol and isopropanol;

wherein the percentages are weight to weight of the composition; and

b.    applying a daily dose of the composition to skin of the subject in an amount sufficient for the testosterone to reach the bloodstream of the subject so as to achieve a serum concentration within a range between about 300 ng testosterone per dl serum to about 1050 ng testosterone per dl serum within at least about 36 hours of daily dosing of the composition.

31.    A method for administering an active agent to a human subject in need thereof, the method comprising:

a.    providing a pharmaceutical composition consisting essentially of:

          (i)    about 0.5% to about 5% testosterone;

          (ii)    about 0.1% to about 5% isopropyl myristate;

          (iii)    about 30% to about 98% of an alcohol selected from the group consisting of ethanol and isopropanol; and

          (iv)    about 0.1% to about 5% of a gelling agent;

wherein the percentages are weight to weight of the composition; and

b.    applying a daily dose of the composition to skin of the subject in an amount sufficient for the testosterone to reach the bloodstream of the subject wherein serum concentration is substantially maintained between about 400 ng testosterone per dl serum to about 1050 ng

> testosterone per dl serum for at least 24 hours
> after the subject has applied the daily dose of
> the composition for at least 2 consecutive days.

73.     A COC, however, only applies to causes of action that arise *after* the issuance of the COC. This rule reflects the policy that the issuance of a patent serves a public notice function; patentees have a duty to prepare carefully their patent applications and then to police their patents when issued for accuracy and correctness to determine whether it contains any errors that require a COC.

74.     Pursuant to 35 U.S.C. § 271(e)(2)(A), the filing of an ANDA constitutes an act of infringement. Thus, in this instance, the infringement claims that arose by operation of Watson and Paddock filing their ANDAs and providing notice thereof arose in May 2003, *prior to* the issuance of the COC. Accordingly, by statute, the COC was inapplicable in that litigation as a matter of law. As a result, Solvay could not properly invoke the "corrected" patent claims in that litigation and since the claims in the patent as issued did not cover AndroGel or AB generic versions of AndroGel, no reasonable litigant could have believed that Watson's and Paddock's generic versions of AndroGel infringed the '894 patent.

75.     In any event, as discussed below, even if the claims "corrected" by the COC were applicable in Solvay's suits against Watson and Paddock, no reasonable litigant could have believed that the "corrected" claims were valid.

**D.     Solvay Sues The Generic Defendants For Infringing The '894 Patent**

76.     In May 2003, Watson filed with the FDA ANDA No. 76-737, for approval of Watson's AB-rated generic equivalent to AndroGel.  Watson's ANDA contained a Paragraph IV certification that the '894 patent was invalid, unenforceable, and/or not infringed by its ANDA.  Watson notified Solvay on July 8, 2003 that Watson had filed an ANDA containing a Paragraph IV certification that the '894 patent was invalid, unenforceable, and/or not infringed by Watson' ANDA.

77.     Following Watson's 2003 ANDA filing and Paragraph IV certification, Solvay sued Watson in August 2003 for infringement of the '894 patent.

78.     In May 2003, Defendant Paddock filed with the FDA ANDA No. 76-744, for approval of Paddock's AB-rated generic equivalent to AndroGel. Paddock's ANDA contained a Paragraph IV certification that the '894 patent was invalid, unenforceable, and/or not infringed by its ANDA.  Paddock notified Solvay that Paddock had filed an ANDA containing a Paragraph IV certification that the '894 patent was invalid, unenforceable, and/or not infringed by Paddock's ANDA.

79.     With its ANDA, Paddock sought a partner to share the costs and risks associated with litigation relating to the '894 patent, together with the rewards

from a successful outcome. In July 2003, Paddock reached a licensing agreement with Par, which was a top-ten generic pharmaceutical company and a veteran of pharmaceutical patent litigation. Pursuant to the licensing agreement, Par agreed to share litigation costs with Paddock, market in the United States the generic version of AndroGel that Paddock would manufacture, and share in the resulting profits. Par entered into the licensing agreement only after conducting diligence on Paddock's ANDA in light of Solvay's formulation patent.

80.    Following Paddock's 2003 ANDA filing and Paragraph IV certification, Solvay sued Paddock in August 2003 for infringement of the '894 patent.

81.    Pursuant to the Hatch-Waxman Act, the filing of the lawsuits against the Generic Defendants triggered a stay under which the FDA was precluded from granting final approval to the Generics' ANDAs for up to thirty months.  Before filing their complaint, Solvay and Besins did not request or seek to obtain (1) any sample of the Generics' proposed drug products, (2) any portion of the Generics' ANDAs, or (3) any other information whatsoever from the Generics relating to their proposed generic products.

82.    Prior to filing their complaint, Solvay and Besins' sole information relating to the Generics' ANDA products were the detailed notice letters

explaining why neither the ANDAs nor the products proposed under those ANDAs would infringe.

83.     Defendant Paddock's ANDA was tentatively approved on October 27, 2004.  Paddock's ANDA received final FDA approval on May 27, 2007.

84.     In late January 2006, Defendant Watson received final approval from the FDA to market its AB-rated generic version of AndroGel, meaning that FDA had determined that Watson's generic AndroGel was as safe and effective as branded AndroGel. Watson was awarded 180 days of marketing exclusivity for being the first to file an ANDA containing a Paragraph IV certification.

### E.     Defendants' Wrongful Scheme to Delay Generic Competition

#### 1.     The Scheme to Improperly Obtain, List and Assert the '894 Patent

85.     Solvay and Besins were well aware that the active drug substance in AndroGel (*i.e.*, testosterone) was known and unpatentable.  They were also aware that, under Hatch-Waxman, their new dosage form exclusivity was set to expire on February 28, 2003 and that ANDAs were likely to be filed seeking approval to market generic versions of AndroGel immediately thereafter.  Desperate to extend their monopoly, Solvay and Besins hatched a scheme to delay generic competition by obtaining a patent, listing that patent in the FDA Orange Book under NDA 21-015 for AndroGel, and delaying would-be competitors from entering the market for up to 30 months by suing them for patent infringement.

86.     Timing was critical to their scheme.  Generics need only file Paragraph IV Certifications with respect to patents listed within the FDA Orange Book.  Absent a patent to list in the Orange Book, Solvay and Besins would not be able to force would-be competitors to file Paragraph IV Certifications and to thereby trigger a 30-month FDA stay by filing suit.

87.     In its fervor to expedite issuance of the '894 Patent, Solvay botched the prosecution of the '894 Patent.  As a result – described further below – Solvay could not reasonably have believed that the '894 Patent was properly listed in the Orange Book or infringed by the products that were the subject of the Generics' ANDAs.  Furthermore, many of the claims in the '894 Patent were clearly invalid and could not reasonably be asserted against the Generics for that reason as well and, in its desperation to "correct" the fatal defects in its '894 Patent, Solvay affirmatively misrepresented facts regarding the '894 Patent to the PTO.

88.     At the time that it submitted the '894 Patent for listing in the FDA's Orange Book, Solvay could not reasonably have believed that the '894 Patent was proper for listing.  The FDA regulations in effect at the time provided that "[f]or patents that claim a drug substance or drug product, the applicant shall submit information only on those patents that claim a drug product that is the subject of a pending or approved application, or that claim a drug substance that is a component of such a product. For patents that claim a method of use, the applicant

38

shall submit information only on those patents that claim indications or other conditions of use of a pending or approved application." 21 C.F.R. 314.53. The then-existing claims of the '894 Patent did not support listing because the '894 Patent did not claim AndroGel (or the testosterone drug substance that is a component of AndroGel) or an approved method of use for AndroGel.

89.    It is well settled law that "[o]ne who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that [independent] claim." *Wahpeton Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989). As a result, unless AndroGel (or an approved method of using AndroGel) fell within the scope of one of the five originally issued independent claims (i.e., claims 1, 9, 10, 18 and 31) of the '894 Patent, it could not fall within the scope of any of the remaining originally-issued claims in the '894 Patent.

90.    Each of originally-issued claims 1, 9, 10 and 18 required a formulation or composition having at least "about 1%" sodium hydroxide. As Solvay has admitted in its pleadings from the patent litigation against the Generics, the phrase "sodium hydroxide" in the originally-issued '894 Patent claims means the pure (anhydrous) form of sodium hydroxide. In addition, Solvay admits that the amount of sodium hydroxide recited in these claims is 50 to 250 times greater than the amount of sodium hydroxide in AndroGel marketed under NDA No. 21-

105.  No reasonable litigant therefore could assert that originally-issued claims 1, 9, 10 or 18 (or the claims depending therefrom) covered either (1) AndroGel (or the testosterone drug substance that is a component of AndroGel) or any generic version of AndroGel or (2) an approved method of use for AndroGel or any generic version of AndroGel.  To the contrary, Solvay admits that a skilled pharmaceutical chemist would recognize that the amount of pure (anhydrous) sodium hydroxide recited in originally-issued claims 1, 9, 10, and 18 "is far too caustic to be used in the claimed formulation" and would do damage to the human skin.  Neither independent claims 1, 9, 10 and 18 nor the claims depending from those claims could reasonably justify the inclusion of the '894 Patent in the Orange Book.

91.    The sole remaining independent claim, claim 31, likewise could not reasonably be construed to cover a method for using the AndroGel product or a generic version of the AndroGel product.  Claim 31 requires, among other things, a "*pharmaceutical composition consisting essentially of*:  (i) about 0.5% to about 5% testosterone; (ii) about 0.1% to about 5% isopropyl myristate;  (iii) about 30% to about 98% of an alcohol selected from the group consisting of ethanol and isopropanol; and (iv) about 0.1% to about 5% of a gelling agent. . . ." (emphasis added)  The transition "consisting essentially of" indicates that a claim "necessarily includes the listed ingredients and is open to unlisted ingredients that do not

materially affect the basic and novel properties of the invention." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998). Thus, for a particular pharmaceutical composition to meet the limitations of claim 31, it (1) must *include* testosterone, isopropyl myristate, a gelling agent, and either ethanol or isopropanol in the required amounts and (2) further must *exclude* any additional ingredient that materially affects the basic and novel properties of the invention. Solvay's own briefing admitted that the basic and novel properties of the invention are the ability to produce plasma levels of testosterone sufficient to be effective in the treatment of hypogonadal patients. Sodium hydroxide materially affects the basic and novel properties of the purported invention because the Carbopol gelling agent in the AndroGel formulation will not function properly (and therefore the formulation will not produce plasma levels of testosterone sufficient to be effective in the treatment of hypogonadal patients) in the absence of sodium hydroxide. Under these circumstances, no reasonable litigant could believe that claim 31 encompassed a method for using AndroGel. Thus, neither claim 31 nor any of its dependent claims could have justified Solvay in submitting the '894 Patent for listing in the Orange Book.

92. For reasons similar to those applicable to Solvay's decision to submit the '894 Patent for listing in the FDA's Orange Book, at the time that it filed suit against the Generics in August 2003 for infringement of the '894 Patent, Solvay

could not reasonably have believed that the manufacture, use or sale of the generic AndroGel products that were the subject of the Generics' ANDAs would infringe the then-existing claims of the '894 Patent.  The generic AndroGel could not have anywhere near "about 1%" sodium hydroxide as required by originally-issued independent claims 1, 9, 10 and 18 (and their dependent claims).  As Solvay admits, the amount of pure (anhydrous) sodium hydroxide recited in originally-issued claims 1, 9, 10, and 18 "is far too caustic to be used in the claimed formulation" and would do damage to the human skin.  Thus, the Generics' ANDA products could not reasonably contain, and Solvay could not reasonably believe that the Generics' ANDA products contained, the amount of sodium hydroxide required by these claims.  No reasonable litigant therefore could assert originally issued claims 1, 9, 10 or 18 (or the claims depending therefrom) against the Generics.  Thus, Solvay's lawsuits against the Generic Defendants were objectively baseless shams which no litigant could reasonably expect to win and were brought and prosecuted for the sole purpose of delaying generic competition.

93.    Solvay's subjective recognition that it had no basis for asserting claims 1, 9, 10 and 18 (and their dependent claims) against the Generics when it filed suit in August 21, 2003 is reflected by its prior filing of a Request for Certificate of Correction on June 12, 2003.  No later than June 12, 2003 (and therefore undoubtedly at the time Solvay filed each suit) Solvay knew of the

fundamental defect in these claims and the impropriety of asserting them against the Generics. Likewise, Solvay undoubtedly knew of the defect in the sole remaining independent claim 31—namely, the combination of a narrow transition "consisting essentially of" and the absence of a limitation reciting sodium hydroxide (or another appropriate base), a critical component of the AndroGel formulation and the generic AndroGel formulations.  Despite subjective recognition of these problems, Solvay nevertheless chose to file suit.

94.     Solvay's contention that the certificate of correction, which did not issue for several months after Solvay filed suit, somehow cured its impropriety, is frivolous.  A certificate of correction is "not effective" for "causes arising before its issuance." *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1294 (Fed. Cir. 2000).  The Federal Circuit reaffirmed this well settled, statutory principle literally the week before the certificate of correction issued.  *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1353 (Fed. Cir. 2003) ("As we held in *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280 (Fed. Cir. 2000), under sections 254 and 255, a certificate of correction is only effective for causes of action arising after it was issued. For causes of action that arise before the correction becomes effective, the patent must be considered without the benefit of the certificate of correction.") (citations and internal quotations omitted).  Thus, Solvay could not reasonably believe that its certificate of correction was effective

for litigation instituted in August 2003.  Furthermore, in the context of ANDA litigation it is the filing of the ANDA that constitutes the infringement under 35 U.S.C. § 271(e)(2)(A).  Thus, the cause of action necessarily arises once and only once – upon the filing of the ANDA – and cannot reasonably be viewed as a continuing tort.

95.     Neither Solvay, nor Besins, nor any reasonable litigant could have believed that claims 1-30 were valid, either in their originally-issued form or their "corrected" form.  Both sets clearly failed to comply with the written description requirement, and the "corrected" set was invalid for the additional reason that Solvay was not entitled to the certificate of correction and that Solvay affirmatively misrepresented facts to obtain it.

96.     "The purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not . . . ." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003). To satisfy the written description requirement, the disclosure of the specification must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991).  Claims 1-30, both in their originally issued form and as "corrected," recite a range of sodium hydroxide weight-to-weight percentages.  The '777 Application as originally filed teaches no

range of sodium hydroxide for a pharmaceutical composition. Instead, the sole

reference to sodium hydroxide was a single weight-to-weight percentage in a

single example in Table 5. When Solvay later added the claimed ranges, it

accomplished the very thing the written description requirement forbids – namely,

"later asserting that [it] invented that which [it] did not." Nothing in the '777

Application could reasonably be viewed as conveying with reasonable clarity to

those skilled in the art that, as of the filing date of the '777 Application, the

inventors were in possession of the ranges of sodium hydroxide later claimed, in

either originally-issued or "corrected" form. Under these circumstances, Solvay

could not reasonably believe that claims 1-30 were valid.

97.    It was also unreasonable for Solvay to believe it was entitled to the

certificate of correction. Section 255 of the patent law permits the Patent Office to

correct either mistakes of "minor character" or mistakes of a "clerical or

typographical nature." 35 U.S.C. § 255. A mistake that, if corrected, would

broaden a claim scope cannot be of "minor character." A broadening correction

can only be made when it is "manifest" or "immediately apparent" and where it is

"clearly evident" for the intrinsic evidence the one appropriate way to correct the

error.

98.    For many reasons, the "error" asserted by Solvay did not – and could

not possibly –satisfy these requirements. A reasonable litigant would have

understood that the certificate of correction was necessarily invalid. Consequently, even had the certificate of correction been effective for the ANDA litigation (which it could not), it did nothing to bolster Solvay's frivolous claims. Furthermore, Solvay deliberately misrepresented the existence of written description support in the '777 Application. Specifically, Solvay represented to the PTO that "the mistakes were made in good faith and that the proper language is contained throughout the specification, see, for example, column 13, Table 5 ("0.1 N NaOH" (sodium hydroxide)). As such, the correction does not involve such changes in the patent that would constitute new matter or that would require reexamination." *See* Ex. 3 to Watson's Memorandum of Law in Support of Its Motion for Partial Summary Judgment, at WA707. These were misrepresentations. The reference to "0.1 N NaOH" appeared only once in (rather than "throughout") the specification and Solvay's requested change did introduce "new matter" because the specification nowhere disclosed any ranges for "0.1 N NaOH" as recited by the purportedly "corrected" claims. Solvay made these misrepresentations knowingly to obtain the certificate of correction.

99.    Watson specifically alleged in its answers and counterclaims that (1) the '894 patent was invalid because the patented subject matter was in public use and/or on sale in this country more than one year prior to the application; (2) Solvay and Besins' patent was unenforceable due to Solvay engaging in

inequitable conduct before the PTO by knowing about, but withholding from the PTO information concerning pre-critical-date sales and commercial transactions information; (3) Solvay and Besins lacked a reasonable and good faith basis to allege infringement; (4) Solvay and Besins filed the infringement action without substantial justification for the wrongful and anticompetitive purpose of extending their unlawful monopoly by invoking the 30-month stay; and (5) patent misuse.  In detailing the bases for its affirmative defenses, Watson described the infringement litigation against it as being "meritless" and alleged Solvay was "improperly using [the litigation]" to obtain extended market exclusivity from FDA and to prevent FDA from approving Watson's product.

100.   In response to the infringement suit, Paddock and Watson also filed counterclaims seeking a declaratory judgment that its product did not infringe and/or that the '894 patent was invalid.

101.   Recognizing the fatal flaws in the '894 Patent, the Generic Defendants moved for summary judgment of invalidity as to certain claims in the patent.  The Generic Defendants would also have moved for summary judgment of non-infringement following the claim construction ruling by the Court.

102.   Both fact and expert discovery concluded by July 2005, i.e., had been pending for over a year before the patent litigation was settled.

103.   The summary judgment briefing between Solvay and Watson relating to invalidity was completed on January 19, 2006, i.e., had been pending for approximately 9 months before the patent litigation was settled.  The only summary judgment briefing between Solvay and Paddock relating to the invalidity motions that remained as of the date of settlement was the submission of Paddock's reply briefs.

104.   As a result of the facts and circumstances detailed above, each of the Defendants knew (or should have known) that, because Solvay's patent claims were objectively baseless, that absent the settlements, Solvay would have lost the patent litigation on the merits.

## 2.   The Illegal Exclusion Payment Agreements

105.   Solvay knew that Hatch-Waxman's automatic 30-month stay would protect AndroGel from facing generic competition until early 2006, and had little incentive to settle before then. However, Solvay also knew that once Watson received final FDA approval, Watson could launch its generic version of AndroGel unless Solvay was able to satisfy the prerequisites for an injunction in the patent case to prevent Watson's launch.  And since Solvay's patent case was without merit, Solvay knew that it would be unable to obtain an injunction against Watson (or Par/Paddock).

106.   Knowing it could not exclude Watson and Par/Paddock through any legal means, i.e., a preliminary injunction, Solvay considered ways to settle the patent litigation and eliminate the near-term threat of generic competition without risking a potential adverse court decision.

107.   In preparation for settlement negotiations with Watson and Par, Solvay put together a financial model to analyze its settlement options, known internally as "Project Tulip." Solvay had already decided that it wanted to defer generic entry until 2015. The purpose of the model was to assess – by evaluating the generics' expected return from continuing to litigate – whether the generic companies would accept this delayed entry date. From the Project Tulip analysis, Solvay concluded that Watson and Par might agree to a settlement that somewhat deferred generic entry. But if Solvay wanted a settlement that delayed generic entry until 2015, it had to pay Watson and Par.

108.   From the Project Tulip model, however, Solvay also realized that it could easily afford to buy Watson's and Par's agreement not to compete, thus eliminating the near-term threat of generic entry. By delaying competition, the parties would preserve monopoly rents that could be shared amongst themselves at the expense of the consumer savings that would result from price competition. Thus, even after paying Watson and Par a share of its profits to secure their agreement to delay entry until 2015, Solvay still expected to make more in

AndroGel profits by delaying generic entry until 2015 than by continuing to litigate.

109.   Solvay's financial model was discussed among the company's CEO and other key executives and formed the basis for Solvay's negotiating strategy. When it negotiated with Watson and Par, Solvay expected that it would need to compensate the generic companies in order to obtain their agreement not to launch generic AndroGel until 2015.

### 3.   Solvay and Watson's Agreement Not to Compete

110.   At the beginning of settlement negotiations, Watson proposed that Solvay share AndroGel revenues with Watson through an arrangement under which Watson would co-promote AndroGel to doctors. Just months before, a consulting firm had helped Solvay conduct a comprehensive analysis of Solvay's AndroGel promotion options. That analysis concluded that AndroGel co-promotion was unlikely for Solvay, and in any event, Watson did not meet the set of criteria for potential co-promotion partners. Yet because Solvay wanted to protect its AndroGel revenues for another nine years (until 2015) Solvay quickly agreed to consider allocating a portion of AndroGel sales to Watson.

111.   Watson was only willing to delay its entry to 2015 if it received compensation for that delay, in this case under the pretextual "co-promotion" agreement.

112.    The amount of Solvay's payment to Watson also had to be substantial

enough to compensate Watson for the risk posed to Watson by Solvay's planned

new version of AndroGel that threatened to destroy the market for AndroGel and

make Watson's generic AndroGel product far less valuable.  Branded

pharmaceutical companies often employ the introduction of a "line extension," or a

new branded product that is similar to the existing product to preserve sales of a

branded franchise in the face of imminent generic competition.  Under this

strategy, the brand company launches the "line extension" and then encourages

switching from the old version to the new line extended version that is not

susceptible to erosion from the imminent entry of an AB-rated generic.

113.    In the case of AndroGel, Solvay plans to develop and market a

testosterone gel containing 1.62% testosterone - more than the 1% testosterone

contained in AndroGel - that would allow patients to achieve similar therapeutic

benefits with less volume of gel.  Solvay plans to shift sales from AndroGel to its

new low volume product before 2015, in part because generic versions of

AndroGel would not be automatically substitutable for Solvay's new branded

product.

114.    Solvay informed Watson of its plans for its line extension product

during settlement negotiations. Watson accepted Solvay's 2015 entry date even

though a line extension product could have a severe negative impact on its

potential sales of AndroGel by 2015. Watson would not have accepted the 2015 entry date in light of these risks absent Solvay's substantial sharing of AndroGel profits through the co-promotion deal.

115.   On September 13, 2006, Solvay and Watson entered written agreements to settle their patent litigation. Under the parties' agreement, Watson agreed to refrain from marketing generic AndroGel until August 31, 2015, or earlier if another generic company launched a generic version of AndroGel before that date. Watson's 180-day exclusivity period meant that Watson effectively could block later generic entrants by delaying its own market entry.

116.   Solvay and Watson simultaneously entered into a co-promotion deal which provided substantial compensation to Watson. At the time it negotiated the deal, Solvay projected it would pay Watson approximately $19 million during the first year of its agreement, rising to over $30 million annually by the end of the deal.

117.   The compensation Solvay agreed to provide Watson was designed to, and did, induce Watson to settle the AndroGel patent litigation by agreeing to refrain from marketing a generic AndroGel until 2015. Rather than compete, Solvay and Watson agreed to share in AndroGel monopoly profits.

118.   Solvay's own financial analysis reflected that Solvay knew that it would be better off sharing its monopoly profits. Solvay knew that it had to pay

Watson to agree to stay off the market until 2015, Solvay's desired generic entry date. At the same time, Solvay knew that because eliminating price competition would preserve its monopoly profits from AndroGel, it could easily afford to pay Watson to delay its entry until 2015.

119.   Watson also knew that it would be better off by cooperating and sharing in Solvay's monopoly profits than by competing.

120.   Solvay and Watson filed a voluntary stipulation of dismissal terminating their patent litigation in the district court. The parties did not file their settlement and co-promotion agreements with the court, nor were the agreements contingent on court approval.

### 4.   Solvay and Par's Agreement Not to Compete

121.   Under its partnership with Paddock, Par was responsible for conducting the patent litigation with Solvay and negotiating any settlement.

122.   Par, like Watson, was only willing to delay its entry to 2016 if it received compensation for that delay, in this case under the pretextual "co-promotion" agreement. In the words of a senior Par executive, Par was looking to "extract payments" from Solvay in settlement negotiations.

123.   During negotiations, Par quickly accepted Solvay's proposed 2016 generic entry date, contingent on the parties' ability to reach agreement on the value that Par would receive in a settlement.

124.   To agree on a value, Solvay and Par exchanged forecasts analyzing the profits Par would make from sales of generic AndroGel beginning in 2007. These forecasts discounted Par's generic AndroGel revenues to reflect Par's probability of prevailing in the patent litigation. According to a senior Solvay executive, Solvay developed these forecasts to "demonstrate to [Par] what [its] options are, either litigate or enter into these – this business arrangement…and if we entered into the business arrangement, we wouldn't be litigating. They go hand in hand."

125.   Based on the discounted value of Par's forecasted profits from selling generic AndroGel from 2007 through 2016 – which Par would forego in a settlement – Solvay and Par were able to "agree on a value" which Par would receive in exchange for settling the litigation. Solvay and Par agreed on the payments Par would receive before agreeing on what Par would do in exchange, other than defer generic entry until 2015.

126.   On May 13, 2006, the parties confirmed via e-mail their "agreed-upon settlement of $12 million per year for 6 years coupled with manufacturing/development and/or a co-promotion between Par and Solvay."

127.   After the parties agreed on the amount that Solvay would pay Par, the parties met to discuss what type of business arrangement would accompany the settlement and how they would allocate the earlier agreed-on payments. The

parties decided that Par would co-promote AndroGel to doctors and receive $10 million annually, and Paddock would serve as back-up manufacturer for AndroGel and receive $2 million annually. As a Besins executive wrote in an email, a "backup manufacturer strategy [was] a partial way to compensate Parr [sic] for not entering the market."

128.   On September 13, 2006 (the same day the Solvay/Watson agreements were signed), Solvay, Besins, Par and Paddock entered into written agreements to settle their patent litigation. Under the parties' settlement, Par and Paddock agreed to refrain from marketing generic AndroGel until February 28, 2016, or earlier if another generic company launched a generic version of AndroGel before that date.

129.   At the same time Par signed its agreements with Solvay, it agreed to transfer $6 million upfront to Paddock through a transfer of title of Paddock's ANDA to Par. This payment was necessary to obtain Paddock's assent to the patent settlement.

130.   The compensation Solvay agreed to provide Par and Paddock was designed to, and did, induce Par and Paddock to settle the AndroGel patent litigation by agreeing to refrain from marketing generic AndroGel until 2016 Rather than compete, Solvay, Par and Paddock agreed to share in monopoly profits.

131.   Solvay's own financial analysis reflected that Solvay knew it would be better of sharing its monopoly profits. Solvay knew that it had to pay Par/Paddock to agree to stay off the market until 2016, Solvay's desired entry date. At the same time, Solvay knew that because eliminating price competition would preserve its monopoly profits from AndroGel, it could easily afford to pay Par/Paddock to delay its entry until 2016.

132.   Par/Paddock also knew that it would be better off cooperating and sharing in Solvay's monopoly profits than by competing.

133.   The district court hearing the patent litigation dismissed Solvay's infringement suit against Paddock under a consent judgment signed by the parties. The parties did not file their settlement, co-promotion and back-up manufacturing agreements with the court, nor were the agreements contingent upon court approval.

### 5.   Defendants' Agreements Only Make Sense When Linked to Delayed Generic Entry

134.   In total, Solvay collectively paid millions of dollars to the Generic Defendants to compensate each of them for agreeing to delay its market entry.

135.   Perhaps mindful that exclusion payments like those described above are per se illegal, Defendants touted the payments in their agreements as fees for, *inter alia*, co-promotion and back-up manufacturing.  These offered rationales were pretextual, and meant to obscure the fact that Defendants agreed to

horizontally allocate the market for the Drug, and that the payments were

essentially Defendants' mechanism for transferring from Solvay to the Generic

Defendants some of the supracompetitive profits that would be earned by Solvay

during the period of delay.  The co-promotion, back-up manufacturing, and other

pretextual rationales for the payments were of little or no real value to Solvay, and

in any event were worth far less than the millions of dollars Solvay paid to the

Generic Defendants pursuant to the agreements.

136.   Solvay's co-promotion deals with both Watson and Par are not

independent business transactions for at least the following reasons:

a.   Prior to settlement discussions with Watson and Par, Solvay
was not looking for co-promotion. Its 2006 business plan for
AndroGel assumed "no co-promotion during the plan period,"
two prior AndroGel co-promotion efforts had been cancelled
because they had "no significant impact" on sales trends, and a
late 2005 analysis from a consulting firm concluded that future
AndroGel co-promotion offered "little revenue upside."

b.   Solvay's payments to Watson and Par far exceeded the value of
any services provided.

c.   Other terms of the co-promotion deals also depart from industry
standards. Among other things, unlike Solvay's previous
AndroGel co-promotion agreements, Solvay cannot terminate
the deal early if co-promotion does not improve AndroGel
sales.

d.   Before agreeing to the co-promotion deals, Solvay did not
analyze how the Watson or Par co-promotion efforts would
affect AndroGel sales, as it did before entering into earlier
AndroGel co-promotion agreements. Solvay instead examined
the "Estimated Impact of Settlement" on Solvay's budget and
accounted for co-promotion as a cost of settlement rather than a

profitable business deal.

137.   Solvay's back-up manufacturing deal with Paddock is not an independent business transaction for at least the following reasons:

a.   The back-up manufacturing deal guarantees Paddock $2 million per year for six years, regardless of whether Paddock ever manufactures AndroGel or ever becomes FDA-qualified to manufacture AndroGel.

b.   Before entering into the back-up manufacturing deal, Solvay conducted no diligence on Paddock's manufacturing facilities. Solvay has paid Paddock $2 million per year since September 2006 despite the fact that Solvay did not even apply for the required FDA approval for Paddock to serve as back-up manufacturer until November 2008.

138.   The anticompetitive agreements between the Defendants were neither examined in-depth nor approved by any court or governmental antitrust authority. Indeed, since news of Defendants' anticompetitive agreements has become public, the Federal Trade Commission and the Attorney General for the State of California have filed suit challenging Defendants' agreements as anticompetitive under Sections 1 and 2 of the Sherman Act.

139.   Given Defendants' collective demonstrated interest in settling the patent litigation and avoiding ultimate adjudication of the patent issues, had Defendants been barred from settling the patent actions with illegal payments from the brand to the generic company, they would have instead agreed to settle the various patent cases in a procompetitive fashion, allowing generics to enter by

September 2006 with licenses from Solvay, earlier than under the agreements at issue, thus saving Plaintiffs millions of dollars.

### 6. Solvay's Patent Was Unlikely to Prevent Generic Competition to AndroGel

140.   Before Solvay paid Watson and Par/Paddock for their agreements not to market their respective generic versions of AndroGel, Watson and Par/Paddock vigorously argued, in motions submitted to the patent court pursuant to Federal Rule of Civil Procedure 11 as well as the perjury statutes, that the '894 patent was invalid.  Among other things, these firms developed substantial evidence that:

- The patent was invalid under 35 U.S.C. § 102(b) for prior commercial sale or public use of the patented invention, in that Besins offered the invention for sale to Solvay in 1995 - a fact that Solvay and Besins withheld from the Patent and Trademark Office.

- The patent was invalid as obvious under 35 U.S.C. § 103 because the gel formulations and related methods covered by the patent were obvious variations of existing products and methods. As a Paddock executive noted in a 2006 e-mail characterizing the views of Paddock's CEO, Paddock was "providing [testosterone] gel formulations to customers over 10 years ago, so the patent simply cannot be valid."

- Many of the patent claims were invalid under 35 U.S.C. § 112 for failure to meet the "written description" requirement.

141.   Watson also argued that the patent was unenforceable because Solvay and Besins did not disclose their 1995 commercial supply agreement to the patent examiner when they applied for the '894 patent. The generic firms also argued that

the certificate of correction that changed the scope of some of the patent claims was invalid and/or did not apply to the pending litigation, which was filed before the certificate of correction issued.

142.   Moreover, and significantly, Watson and Par/Paddock also argued that their products did not infringe Solvay's patent, i.e., fell outside the limited scope of the patent claims, because their products contained different ingredients, and ingredients in different amounts, than the ingredients specified in the '894 patent.

143.   Watson and Par/Paddock developed significant evidence during Solvay's patent suits to support their arguments that their generic products did not infringe Solvay's patent.

144.   The existence of these strong and well-supported non-infringement arguments are significant for various reasons. First, in addition to the invalidity and unenforceability arguments described above, these arguments created a substantial avenue by which Watson and Par/Paddock, absent the multi-million dollar payments, could have prevented Solvay from obtaining a court order preventing them from competing with Solvay.

145.   Second, while there is a rebuttable presumption that a patent is valid, there is no presumption of infringement. To the contrary, controlling patent law indisputably provides that the burden of proving infringement falls squarely on the patent holder. As a result, unless and until Solvay met its burden that Watson and

Par/Paddock's generic versions of AndroGel infringed the '894 patent, i.e., made a showing sufficient for Solvay to obtain a court-ordered injunction precluding Watson and Par/Paddock from selling their generic products, it was presumed under applicable patent law that their generic products did not infringe the '894 patent. Consequently, Solvay's multi-million dollar payments to Watson and Par/Paddock clearly exceeded the limited scope of the '894 patent.

146.   Solvay was unlikely to prevent generic entry through its patent lawsuits.  To do so, Solvay not only had to defeat each of the generics' invalidity and unenforceability arguments, but also had to affirmatively prove infringement by both Watson and Par/Paddock. If either Watson or Par/Paddock had prevailed on any one of these issues, Solvay's '894 patent would not have prevented generic entry.

147.   By late 2005, Watson and Par/Paddock had filed motions for summary judgment on issues relating to invalidity and unenforceability, and addressed others in claim construction briefing and expert reports.  By contrast, Solvay, which bore the burden of proving that Watson and Par/Paddock each infringed the '894 patent, had not met its burden when the litigation ended in settlements.

148.   Solvay and Besins recognized the weakness of their patent claims as evidenced by their willingness to pay the Generic Defendants millions of dollars to

refrain from entering the market rather than seeking injunctive relief from the Court.

## IV.    Effect on Interstate Commerce

149.   At all material times, AndroGel, sold by Defendant Solvay, was shipped across state lines and sold to customers located outside its state of manufacture.

150.   During the relevant time period, in connection with the purchase and sale of AndroGel, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

151.   During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce.  The activities of Defendants, as charged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

## V.    Monopoly Power

152.   Through the anticompetitive conduct alleged herein, Solvay was able to profitably charge supracompetitive prices for AndroGel without losing substantial sales, and thus, by definition, maintained monopoly power with respect to AndroGel and any generic substitutes sold in the United States. To the extent

that Plaintiffs are required legally to prove monopoly power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant product market is AndroGel and AB-rated bioequivalent versions of AndroGel.  There are no reasonable economic substitutes for AndroGel other than AB-rated bioequivalent versions of AndroGel.  For the entire period relevant to this case, Solvay has been able to profitably maintain the price of AndroGel well above competitive levels without losing substantial sales.

153.   The relevant geographic market is the United States and its territories.

154.   Solvay's market share in the relevant market is and was 100% at all times relevant to this complaint.

155.   Defendants' actions are part of, and in furtherance of, the illegal restraint of trade and monopolization alleged herein, were authorized, ordered or done by Defendants' officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

156.   Defendants' illegal acts to prevent the introduction and/or dissemination into the U.S. marketplace of any AB-rated generic versions of AndroGel resulted in Plaintiffs paying more than they would have paid for their Androgel requirements absent Defendants' illegal conduct.

## VI.    Effects on Competition and Damages to Plaintiffs

157.   Defendants' exclusionary conduct has delayed or prevented the sale of AB-rated generic versions of AndroGel in the United States, and unlawfully enabled Defendants to charge artificially inflated prices for Androgel requirements.

158.   Absent Defendants' illegal conduct, generic competition would have already occurred, and Plaintiffs would have been able to purchase AndroGel and its generic equivalents at significantly lower prices that they were forced to pay because of Defendants' illegal acts to delay generic competition.

### A.    But For the Improper '894 Patent Listing and sham Litigation, Generic AndroGel Products Would Have Already Entered the Market

159.   Watson received final FDA approval to market its generic AndroGel product on January 27, 2006, shortly after the expiration of the 30-month stay of FDA approval.  But for the improper listing and sham litigation, Watson could have, and would have, begun marketing its generic AndroGel product immediately upon receiving FDA final approval which would have occurred by no later than January 27, 2006.

160.   Par/Paddock received tentative approval to market its generic AndroGel product on October 27, 2004.  Tentative approval means that: (a) the FDA has determined that the generic product is safe, effective and bioequivalent to its name brand counterpart; and (b) the only barrier to the grant of final approval to

sell the generic product is the existence of some form of legal or regulatory exclusivity – such as the 30-month stay of FDA approval that applied once Solvay sued Par/Paddock for infringing the '894 patent. Par/Paddock received final FDA approval to market its generic AndroGel product on May 27, 2007. But for the improper listing and sham litigation, Par/Paddock could have, and would have, begun marketing its generic AndroGel product at least no later than May 27, 2007. But for Defendants' wrongful conduct, Par/Paddock may have had the ability and the incentive to get final FDA approval before May 27, 2007.

**B.    But For The Illegal Exclusion Payment Agreements, Generic AndroGel Products Would Already Be On the Market**

161.   Moreover, but for the filing of Solvay's sham patent cases against the Generic Defendants, the illegal exclusion payment agreements – which purported to settle these patent cases – would not have existed and therefore would not have precluded generic entry until 2015. As a result, but for the filing of the sham suits, Watson and Par/Paddock would have begun marketing their AB rated generic versions of AndroGel by no later than January 2006 and May 2007, respectively.

162.   Even assuming that the patent cases would have existed in the "but for" world, the Generic Defendants would have already marketed AB rated generic versions of AndroGel in one of several alternative ways.

163.   First, had Defendants not settled the '894 patent litigations with an illegal exclusion payment, Solvay and the Generic Defendants would have entered into legal settlements of their patent litigation.

164.   Empirical evidence has shown that exclusion payments are not at all necessary to settle Hatch-Waxman cases. As the Federal Trade Commission stated in its January 17, 2007 testimony before the Senate Judiciary Committee, "there were at least as many settlements" between brand and generic pharmaceutical companies during the period of time when exclusion payments had stopped because of FTC enforcement actions as there were "in the seven years in which pharmaceutical companies were settling litigation with payments and restrictions on entry."[2]   The FTC found empirically that the number of settlements did not decrease as a result of restricting exclusion payment agreements. Manufacturers continued settling Hatch-Waxman cases at the same rate as before, only without exclusion payments; they simply settled with early-entry licenses, as opposed to payments not to compete.  It is both typical, and economically rational, for parties to settle patent litigation by providing the alleged infringer with a license to market the claimed invention.

_____

[2]  *See* Prepared Statement of the Federal Trade Commission Before the Committee On the Judiciary of the United States Senate on Anticompetitive Patent Settlements In the Pharmaceutical Industry: The Benefits of A Legislative Solution, January 17, 2007 *available a t* http://www.ftc.gov/speeches/leibowitz/070117anti competitivepatent settlements _senate.pdf.

165.   When it negotiated with the Generic Defendants, Solvay expected that it would need to compensate the generic companies in order to obtain their agreement to delay their launch generic AndroGel until 2015.  By no later than September 2006, Solvay and the Generic Defendants agreed that Solvay would pay the Generic Defendants to cease their challenge to the validity of Solvay's '894 patent and to delay launching their generic AndroGel products until at least 2015. Solvay would have had no need to pay the Generic Defendants not to enter the market, if the Generic Defendants had not planned to, and/or could not have, entered the market significantly before 2015.

166.   If Solvay could not have paid the Generic Defendants not to market their generic AndroGel products, as the Generic Defendants otherwise would have done, the parties would have agreed to settle the litigation by permitting the Generic Defendants to enter the market earlier than under the challenged agreements.  Solvay and the Generic Defendants would have agreed to permit generic entry as early as September 2006, and no later than May 27, 2007, pursuant to a royalty-bearing or non-royalty-bearing license.

167.   Solvay would not have settled with one, but not both, of the Generic Defendants.  Brand pharmaceutical companies have little incentive to settle with only one of their potential generic challengers.  For example, here, the purpose of the settlements was to cease the Generic Defendants' challenges to the validity of

the '894 patent and guarantee Solvay's monopoly over AndroGel until at least

2015.  Under the terms of the Agreement between Watson and Solvay, Watson

could come to market prior to 2015 if another generic company entered the market.

It would make no sense to end Watson's patent challenge, but permit

Par/Paddock's patent challenge to continue, because an invalidity ruling achieved

in the Par/Paddock litigation would invalidate all intellectual property rights

Solvay claimed to possess under the '894 patent, and permit any potential generic

competitor to practice Solvay's claimed invention, thereby eliminating Solvay's

monopoly and give Watson the right to enter the market.  Because that was the

precise result that Solvay intended to avoid, Solvay paid off both of its potential

generic competitors.  In another example, the brand manufacturer Cephalon, Inc.

entered into exclusion payment agreements with the four first-filing generic

manufacturers that challenged the patent that Cephalon claimed covered its drug,

Provigil.  Under those agreements, Cephalon paid the generic manufacturers

millions of dollars in exchange for the generics' agreements not to market their

generic Provigil products for at least six years.  Subsequent to those four

settlements, Cephalon also settled patent litigation with subsequent filer Watson.  It

would have made no sense for Cephalon to settle with the first filers, only to

permit Watson to continue its patent challenge, and to potentially enter the market

years before the end of the guaranteed exclusion period Cephalon had paid the first filers handsomely to obtain.

168.   Second, if Defendants could not agree on a settlement that provided for licensed entry by the Generic Defendants, the Generic Defendants would have launched their generic AndroGel products before a final resolution of the '894 patent litigations, *i.e.*, "at risk."  It is not uncommon for generic pharmaceutical manufacturers to launch their generic products "at risk."

169.   Once the Generic Defendants received final FDA approval to market their generic AndroGel products, the only legal way Solvay could have prevented an "at risk" launch was to obtain a preliminary injunction.  Solvay, however, could not have obtained a preliminary injunction preventing the Generic Defendants from launching their generic AndroGel products "at risk" because, in order to obtain a preliminary injunction preventing Watson and Paddock from marketing their generic AndroGel products after expiration of the 30-month stay, Solvay would have been required to establish, *inter alia*, that it was likely to succeed on the merits of its patent infringement suits.

170.   Solvay could not have demonstrated a likelihood of success on the merits of its patent infringement claims because its suits against Watson and Paddock were objectively and subjectively baseless "shams."  Even if Solvay's infringement suits were not so baseless as to constitute sham litigation, the

weakness of Solvay's patent claims, and the strength of the invalidity and non-infringement defenses raised by the Generic Defendants in the underlying patent cases would have precluded Solvay from obtaining a court order enjoining generic competition.  In other words, even if Solvay's infringement suits were not so baseless as to constitute sham litigation, Solvay could not have established a likelihood of success on the merits because it was highly likely that, but for the settlements, Solvay would have lost the patent cases on the merits.  Had the '894 patent litigations been litigated to their conclusion, the Generic Defendants would have won.

171.   Solvay expressly recognized that the patent litigation could not keep Watson off the market once it had received final approval, anticipating that Watson might launch "at risk."  Solvay's Chief Executive Officer reported to his superiors in Europe that Watson might launch sometime in 2006 even if the patent litigation had not concluded: "The next event will be a court hearing probably in June [2006].  They could then launch if things go well for them."

172.   Because Solvay's patent infringement claims against Watson and Paddock were a "sham," (or, in the alternative, very weak), Watson and Paddock would have been able to stay on the market with their non-infringing generic AndroGel products after launching "at risk."  Alternatively, the Defendants may

have entered into a settlement with a royalty-bearing license, following "at risk" entry.

173.   Even if Watson or Par/Paddock did not launch "at risk," generic competition for AndroGel would have already occurred, but for Defendants' wrongful conduct, because Solvay would have ultimately lost the patent litigation. As alleged above, Solvay's patent suits against Watson and Paddock were baseless shams.  As such, Solvay would have lost these baseless suits, had they not been settled with illegal exclusion payments.  Even if the patent suits were not so baseless as to constitute a sham, the suits were weak; the '894 patent was weak; the Generic Defendants' defenses were strong; Solvay would have lost its suits on the '894 patent on the merits; and generic AndroGel would have been on the market well before 2015.  If one of the '894 patent litigations were litigated to a final resolution, both of the '894 patent litigations would have been litigated to a final resolution.  That is because Solvay would have had no incentive to settle with only one of the Generic Defendants.

**C.     The Parties Expected Generic AndroGel Products to Enter the Market As Early As 2006 and Quickly Capture the Bulk of AndroGel Sales**

174.   Even though the '894 patent did not expire until 2020, Solvay, the Generic Defendants, and the investment community each expected that the Generic Defendants would launch their generic AndroGel products as early as mid-2006.

175.   In early 2006, Solvay analyzed the risk from potential generic competition to AndroGel occurring in mid-2006.  Solvay estimated that if generic products were to launch in mid-2006, Solvay would lose approximately 90% of its AndroGel sales within a year.  Even factoring in the cost savings to Solvay from not purchasing and promoting AndroGel, Solvay estimated that generic competition would cut its profits by approximately $125 million a year.  As the company's CEO noted at the time, "the economics are obviously not good."

176.   In February 2006, Par forecast that Watson would begin marketing its generic AndroGel product in March 2006, and that Par would begin marketing its generic AndroGel product in September 2006.  Par's CEO told investment analysts in February 2006 that if generic AndroGel did not launch in 2006, "it should certainly hit in 2007."

177.   Par forecast that, upon entry, generics would capture the majority of all AndroGel sales and cause steep price reductions.  For example, Par forecast in February 2006 that 90% of all prescriptions would go to generic products and that the price of generic AndroGel would fall to 15% of the branded price within a year of generic launch.

178.   Watson projected a similar dramatic impact from generic entry. Watson forecast that generic entry in January 2007 would cause generics to capture

nearly 80% of all prescriptions and prices to fall to about 25% of the price of branded AndroGel within a year of generic entry.

179.   Both Watson and Par/Paddock undertook concrete steps to prepare for generic launch consistent with the 2006 timeframe.  Paddock, which had an average annual company-wide equipment budget of approximately $1 million, spent approximately $750,000 on commercial manufacturing equipment for generic AndroGel.  Watson also ordered commercial manufacturing equipment for AndroGel and planned for manufacturing validation in mid-2006 and commercial manufacturing in late 2006.

180.   In addition to Solvay and the Generic Defendants, investment analysts also expected generic AndroGel to launch in the 2006-2007 time-frame, even though the patent did not expire until 2020 (2021, with pediatric exclusivity).  For example, one analyst reported in April 2006 that Watson could potentially launch generic AndroGel "near term." Buck, D.G. et al., Buckingham Research Group, "Specialty Pharmaceuticals - Updating Expected News Flow Grid," Report No. 11105570, April 5, 2006.

181.   Other analyst reports, at the time of the settlements in September 2006, assumed a generic AndroGel launch in 2007.  *See* Buck, D.G., Buckingham Research Group, "Watson Pharmaceuticals, Inc.," Report NO. 11581629, September 14, 2006; Cacciatore, K. et al., SG Cowen Securities Corp., "Watson

Pharmaceuticals, Inc.," Report No. 11580774, September 14, 2006; Cacciatore, K. et al., SG Cowen Securities Corp., "Par Pharmaceutical Companies Inc.," Report No. 11581616, September 14, 2006.

182.   One of these analysts noted that the multimillion dollar exclusion payments the Generic Defendants received "offset" the earnings lost as a result of their agreements not to market their products, as previously expected.  Cacciatore, K. et al., SG Cowen Securities Corp., "Par Pharmaceutical Companies Inc.," Report No. 11581616, September 14, 2006.

183.   The fact that Solvay, the Generic Defendants, and the investment community each expected generic AndroGel products to be marketed as early as 2006, when the '894 patent did not expire until 2020 (with pediatric exclusivity through February 2021), indicates that, absent Defendants' illegal conduct, generic AndroGel products would already be on the market.

184.   If manufacturers of AB-rated generic versions of AndroGel had entered the marketplace and effectively competed with Androgel earlier, as set forth above, Plaintiffs would have substituted those lower-priced AB-rated generic versions for the higher-priced brand name AndroGel for some or all of their Androgel requirements.

185.   During the relevant period, Plaintiffs purchased substantial amounts of AndroGel directly from Solvay. As a result of Defendants' illegal conduct

alleged herein, Plaintiffs paid artificially inflated prices for Androgel. Plaintiffs paid prices for Androgel that were substantially greater than the prices that they would have paid for AB-rated generic versions of Androgel absent the illegal conduct alleged herein.  As a consequence, Plaintiffs sustained substantial damage to their business and property in the form of overcharges.

## COUNT I
### Restraint of Trade In Violation of Section 1
### of the Sherman Act And Conspiracy to Restrain Trade,
### Against All Defendants

186.   Plaintiffs repeat and incorporate by reference the allegations of ¶¶ 1-185 above.

187.   Beginning in or about September 2006, Solvay and each of the Generic Defendants engaged in continuing illegal contracts, combinations and conspiracies in restraint of trade, the purpose and effect of which was to: (a) allocate all sales of AndroGel or its generic substitutes in the United States to Solvay; (b) prevent the sale of generic AndroGel in the United States, thereby protecting AndroGel from any generic competition; and (c) fix the price at which direct purchasers would pay for AndroGel at the higher, branded price.

188.   By entering into these unlawful conspiracies, Defendants have unlawfully conspired in restraint of trade and committed a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants' agreements are horizontal market

allocation and price-fixing agreements between actual or potential competitors, and thus are *per se* violations of Section 1.  In the alternative, Defendants' agreements are unreasonable restraints of trade in violation of Section 1, when viewed under a "quick look" or "rule of reason" mode of analysis.

189.   Plaintiffs have been injured in their business and property by reason of Defendants' unlawful contract, combination and conspiracy.  Plaintiffs have paid more on their purchases of AndroGel than they would have paid absent Defendants' illegal conduct, and/or were prevented from substituting a cheaper AB-rated generic for their purchases of the more expensive AndroGel.

190.   As a result of Defendants' illegal conduct, Plaintiffs paid more than they would have paid for AndroGel or its generic equivalent, absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun marketing generic versions of AndroGel likely in 2006, and, in any event, well before 2015.

191.   If manufacturers of AB-rated generic AndroGel entered the market and competed with Solvay in a full and timely fashion, Plaintiffs would have substituted lower-priced AB-rated generic versions of AndroGel for the higher-priced brand name AndroGel for some or all of their AndroGel requirements, and/or would have received lower prices on some or all of their remaining AndroGel purchases.

192.   During the relevant period, Plaintiffs purchased substantial amounts of AndroGel directly from Solvay.  As a result of Defendants' illegal conduct alleged herein, Plaintiffs were compelled to pay, and did pay, artificially inflated prices for their AndroGel requirements. Plaintiffs paid prices for AndroGel that were substantially greater than the prices that they would have paid for AB-rated generic versions of AndroGel absent the illegal conduct alleged herein, because Plaintiffs were deprived of the opportunity to purchase lower-priced AB-rated generic versions of AndroGel of instead of the more expensive brand name AndroGel.

## COUNT II
### Monopolization in Violation of Section 2 of
### the Sherman Act Against Solvay

193.   Plaintiffs repeat, and incorporate by reference, the allegations above in ¶¶ 1-185 above.

194.   Solvay used various willful and exclusionary means as part of a scheme described herein to improperly maintain and extend their monopoly power over the market for AndroGel and its generic equivalents, as detailed above.

195.   The goal, purpose and/or effect of Solvay's scheme was to prevent, delay, and/or minimize the success of the entry of generic competitors which would have sold AB-rated generic versions of AndroGel in the United States at prices significantly below Solvay's prices for AndroGel, which would have

effectively caused the average market price of AndroGel and its AB-rated generic substitutes to decline dramatically.

196.   The goal, purpose and/or effect of Solvay's scheme was also to maintain and extend Solvay's monopoly power with respect to AndroGel and any generic equivalents.  Solvay's illegal scheme to prevent, delay, and/or minimize the success of the introduction into the United States marketplace of any generic version of AndroGel enabled Solvay to continue charging supra-competitive prices for AndroGel without a substantial loss of sales.

197.   As a result of Solvay's illegal conduct, Plaintiffs paid more than they would have paid for AndroGel and its AB-rated generic substitutes, absent Solvay's illegal conduct. But for Solvay's illegal conduct, competitors would have begun marketing AB-rated generic versions of AndroGel well before they actually will.

198.   If manufacturers of generic AndroGel entered the market and competed with Solvay in a full and timely fashion, Plaintiffs would have substituted lower-priced generic versions of AndroGel for the higher-priced brand name AndroGel for some or all of their AndroGel requirements.

199.   During the relevant period, Plaintiffs purchased substantial amounts of AndroGel directly from Solvay.  As a result of Defendants' illegal conduct alleged herein, Plaintiffs were compelled to pay, and did pay, artificially inflated

prices for their AndroGel requirements. Plaintiffs paid prices for AndroGel that were substantially greater than the prices that they would have paid for AB-rated generic versions of AndroGel absent the illegal conduct alleged herein, because Plaintiffs were deprived of the opportunity to purchase lower-priced AB-rated generic versions of AndroGel of instead of the more expensive brand name AndroGel.

200.   Solvay's scheme was in the aggregate an act of monopolization undertaken with the specific intent to monopolize the market for AndroGel and its generic equivalents in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT III
### Conspiracy to Monopolize In Violation of Section 2
### of the Sherman Act Against All Defendants

201.   Plaintiffs repeat, and incorporate by reference, the allegations in ¶¶ 1-185 above.

202.   As detailed above, the Generic Defendants conspired with Solvay to monopolize the market for AndroGel and any generic equivalents, *inter alia*, agreeing to keep their generic versions off the market for nearly a decade in exchange for substantial cash payments.  All Defendants committed at least one overt act in furtherance of the conspiracy, which affected interstate commerce.

203. During the relevant period, Plaintiffs purchased substantial amounts of AndroGel directly from Solvay. As a result of Defendants' illegal conduct alleged herein, Plaintiffs were compelled to pay, and did pay, artificially inflated prices for their AndroGel requirements. Plaintiffs paid prices for AndroGel that were substantially greater than the prices that they would have paid for AB-rated generic versions of AndroGel absent the illegal conduct alleged herein, because Plaintiffs were deprived of the opportunity to purchase lower-priced AB-rated generic versions of AndroGel of instead of the more expensive brand name AndroGel.

## VII. DEMAND FOR JURY

204. Plaintiffs demand trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that:

(i) The acts alleged herein be adjudged and decreed to be an unlawful restraints of trade in violation of Section 1 of the Sherman Act; and willful acts of monopolization in violation of Section 2 of the Sherman Act;

(iii) Plaintiffs recover three-fold the damages determined to have been sustained by each of them, and that joint and several judgment be entered against Defendant in favor of the Plaintiffs;

(iv)    Plaintiffs recover their costs of suit, including reasonable attorneys'

fees as provided by law; and

(v)    Plaintiffs be granted such other, further and different relief as the

nature of the case may require or as may be determined to be just, equitable, and

proper by this Court.

__s/ Steve D. Shadowen_____
Steve D. Shadowen (PA41953)
Hangley Aronchick Segal & Pudlin
30 North Third Street
Harrisburg, PA 17101
Telephone: (717) 364-1030
Facsimile: (717) 364-1020
sshadowen@hangley.com

Joseph T. Lukens (PA67405)
Hangley Aronchick Segal & Pudlin
One Logan Square, Ste. 2700
18th and Cherry Streets
Philadelphia, PA 19103
Telephone: (215) 496-7032
Facsimile: (215) 568-0300
jlukens@hangley.com

Dated: June 17, 2009